## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In re: | Jointly Administered |
| EPIC Companies Midwest, LLC, | Bk. Case No. 24-30281 |
| EPIC Companies Midwest 2023, LLC, | Bk. Case No. 24-30282 |
| EPIC Employee, LLC, | Bk. Case No. 24-30283 |
| EOLA Capital, LLC, and | Bk. Case No. 24-30284 |
| EC West Fargo, LLC, | Bk. Case No. 24-30285 |
| Debtors. | Chapter 11 |

EPIC Companies Midwest, LLC,
EPIC Companies Midwest 2023, LLC,
EOLA Capital, LLC, and
EC West Fargo, LLC,

      Plaintiffs,

v.                                Adv. Proc. No. 25-07008

EPIC Gateway LLC,
EPIC Gateway North Real Estate Holdings,
LLC, and
Gateway Arches Real Estate Holdings, LLC
f/k/a EPIC Gateway East Real Estate Holdings,
LLC,

      Defendants.

---

## ORDER DENYING SUMMARY JUDGMENT

---

On March 16, 2026, this adversary proceeding came before the Court on the Plaintiffs'

Motion for Summary Judgment as to Fraudulent Transfer Claims. Dkt. No. 45. Appearances were

made by Mark Western for the Plaintiffs; Michael Gust for Defendant EPIC Gateway LLC; and

George Singer for Defendants EPIC Gateway North Real Estate Holdings, LLC and Gateway

1

Arches Real Estate Holdings, LLC f/k/a EPIC Gateway East Real Estate Holdings, LLC. The Court heard oral arguments and took the matter under advisement.

The Court has considered the parties' briefs, affidavits, and arguments. The Court also has considered the history and posture of this adversary proceeding. For the reasons explained below, the Court denies summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The EPIC Companies are affiliated entities that engaged in real estate development throughout North Dakota. On July 8, 2024, several of the EPIC Companies filed petitions under Chapter 11. Those cases were jointly administered and substantively consolidated, and the Debtors' Amended Chapter 11 Plan of Liquidation was confirmed on August 6, 2025.

This is one of the many adversary proceedings arising out of the EPIC Companies' business transactions. Plaintiffs EPIC Companies Midwest, LLC ("EPIC Midwest"); EPIC Companies Midwest 2023, LLC ("EPIC 2023"); EOLA Capital, LLC ("EOLA"); and EC West Fargo, LLC ("ECW") are four of the EPIC Companies that are debtors in the Chapter 11 cases. The EPIC Companies also formed separate entities—so-called "project companies"—for each property or parcel of land being developed. Defendants EPIC Gateway, LLC ("Gateway"); EPIC Gateway North Real Estate Holdings, LLC ("Gateway North"), and Gateway Arches Real Estate Holdings, LLC ("Gateway Arches") are three of those project companies.

Here, the Defendants allegedly received (and failed to repay) loans from the Plaintiffs. EPIC Midwest made loans to Gateway North and Gateway Arches; EPIC 2023 made loans to Gateway Arches and Gateway; and EOLA and EC West made loans to Gateway Arches. (The parties have settled the claims against Gateway North, and the Court approved the settlement on March 3, 2026. Dkt. No. 59.) During the first months of this adversary proceeding, there was a

dispute over jury trial rights and the validity of the related promissory notes, which contained a jury trial waiver. However, the parties ultimately stipulated to dismissal of the contract claims under the notes. See Dkt. No. 43. The parties' proposed order stated that "this matter shall be set on for a jury trial." Dkt. No. 43-1 at 2.

In this summary judgment motion, the Plaintiffs now seek summary judgment on Counts XXV–XXXVII of the Complaint. In Counts XXX and XXXIII, the Plaintiffs seek to avoid and recover constructively fraudulent transfers under 11 U.S.C. §§ 548(a)(1) and 550(a). In Counts XXV–XXIX, XXXI–XXXII, and XXXIV–XXXVII, the Plaintiffs seek to avoid and recover constructively fraudulent transfers under the North Dakota Uniform Voidable Transfers Act pursuant to 11 U.S.C. §§ 544(b) and 550(a). The statutory language differs slightly, but both theories require the Plaintiffs to show that the Plaintiffs received less than reasonably equivalent value for transfers made while insolvent (among other statutory indicia).

Based largely on financial analysis conducted by Mr. Patrick Finn (the Plaintiffs' Chief Restructuring Officer and Liquidating Trustee), the Plaintiffs argue there is no genuine factual dispute that the Plaintiffs transferred funds to the Defendants and received less than reasonably equivalent value for the transferred funds. The Plaintiffs further argue there is no genuine factual dispute that: (1) the Plaintiffs had or were left with unreasonably small assets at the time of the transfers; (2) the Plaintiffs were unable to pay their debts due to the transfers; and (3) the Plaintiffs were or became insolvent at the time of the transfers. (The Plaintiffs argue they have shown all three of these facts, but the statutes only require the Plaintiffs to show one.) Therefore, the Plaintiffs argue they are entitled to judgment as a matter of law.

The Defendants first respond that the Plaintiffs' motion is procedurally improper and untimely. The Defendants argue that: (1) the stipulation dismissing the contract claims required

this adversary proceeding to be set on for a jury trial; (2) the Court's scheduling order required this adversary proceeding to be trial-ready by December 2025; and (3) this motion is untimely under Federal Rule of Civil Procedure 56. Therefore, the Defendants argue the Court should not consider the motion's merits.

Alternatively, the Defendants argue that there are several fact issues and defenses that preclude summary judgment. The Defendants argue that: (1) the nature of the relevant transfers is unclear; (2) the Plaintiffs have not established a lack of reasonably equivalent value for each transfer; (3) the Plaintiffs did not establish the size of their assets at the time of each transfer; (4) the Plaintiffs did not establish that debts went unpaid as a result of the transfers; and (5) the Plaintiffs' insolvency analysis was logically flawed, not specific to the dates of the transfers, relies solely on Finn's reports, and is contradicted by other documents that Finn prepared and signed. The Defendants also assert various affirmative defenses. Therefore, the Defendants argue summary judgment is inappropriate.

## LEGAL STANDARD

Federal Rule of Bankruptcy Procedure 7056 incorporates Federal Rule of Civil Procedure 56, making it apply to adversary proceedings. Therefore, summary judgment is appropriate where "there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986) (quoting Fed. R. Civ. P. 56(c)). Summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he Court views the facts in the light most favorable to the nonmoving party and allows that party the benefit of all reasonable inferences to be drawn from the evidence." Primerica Life Ins. Co. v. Woodall, 975 F.3d 697, 699 (8th Cir. 2020) (quoting Prudential Ins. Co. v. Hinkel, 121 F.3d 364, 366 (8th Cir. 1997)). The

4

Court must consider the particular parts of the record cited by the parties and also may consider other materials in the record. Fed. R. Civ. P. 56(c)(1).

## DISCUSSION

The Court agrees that the Plaintiffs' summary judgment motion is procedurally improper. The parties stipulated that this adversary proceeding shall be set on for a jury trial, and the Court's scheduling order required this matter to be trial-ready by December 15, 2025. However, even if the Court reaches the merits, summary judgment is inappropriate.

### I.        The Plaintiffs' Summary Judgment Motion Is Procedurally Improper

The Plaintiffs filed this adversary proceeding on February 21, 2025. Dkt. No. 1. The Defendants' answers included demands for a jury trial, which the Plaintiffs opposed. Dkt. Nos. 4, 7, 13. The Court subsequently entered a scheduling order with a discovery deadline of October 15, 2025, and a trial-ready deadline of December 15, 2025. Dkt. No. 15.

Then, the Plaintiffs contended that the Defendants waived their jury trial rights pursuant to the "Waiver of Jury Trial" provision in the promissory notes at issue. However, fact disputes regarding the validity and enforceability of the notes and the waiver required an evidentiary hearing. Therefore, an evidentiary hearing was set for January 12 and 13, 2026. Dkt. Nos. 37, 42.

On December 15, 2025 (the day the case was to be trial-ready), the parties filed a stipulation for the dismissal of the contract claims. Dkt. No. 43. The next day, the Court entered an order dismissing the contract claims using the following language, which was taken verbatim from the parties' proposed order:

> Pursuant to Rule 7041 of the Federal Rules of Bankruptcy Procedure and Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure, Counts I, II, III, IV, V, and VI (breach of contract claims) of Plaintiffs' Complaint are hereby dismissed, with prejudice, on the merits, and without costs or disbursements to any party. Because the Plaintiffs' breach of contract claims are dismissed and consequently, the validity of the Promissory Notes in this proceeding are no longer at issue regarding

the jury trial waiver and as such, <u>this matter shall be set on for a jury trial</u>, counsel's
participation in the Evidentiary Hearing Ordered for January 12-13, 2026 (see Doc.
ID No. 42) is no longer necessary or required.

Dkt. No. 44 at 1–2 (emphasis added). Then, on January 26, 2026, the Plaintiffs filed this summary

judgment motion. Dkt. No. 45.

### A.  The Stipulation And The Scheduling Order Make This Motion Improper.

The Defendants argue the stipulation is clear: this matter shall be set on for a jury trial. Dkt.

No. 53 at 10–11; Dkt. No. 56 at 18. The Defendants argue that a request for summary judgment is

precluded by this matter's stipulated posture. Dkt. No. 56 at 18. In addition, the Defendants wonder

what would prevent the Plaintiffs from bringing subsequent summary judgment motions on the

remaining claims. Dkt. No. 53 at 11.

The Plaintiffs believe the stipulation was not intended to waive the ability to file dispositive

motions. Dkt. No. 64 at 11:00–12:27. The Plaintiffs assert that dismissing contract claims does not

bar a summary judgment motion on remaining claims. Dkt. No. 60 at 5. The Plaintiffs also assert

that agreeing that the remaining claims "shall be set on for jury trial" does not preclude a summary

judgment motion. Dkt. No. 60 at 5–6; Dkt. No. 64 at 05:12–06:17. The Plaintiffs note that the

stipulation does not expressly address summary judgment motions. Dkt. No. 64 at 05:32–44.

The Court agrees with the Defendants. The stipulation provides that "this matter shall be

set on for a jury trial." Dkt. No. 44 at 2. However, summary judgment decides a matter without a

jury trial. Requesting that a matter be decided on summary judgment conflicts with an agreement

to set that matter on for a jury trial. This makes the Plaintiffs' motion procedurally improper.

Stipulations of various kinds are an invaluable part of the litigation process. However, no

one would enter into stipulations if, absent exceptional circumstances, courts did not enforce them.

Because the stipulation is clear and no exceptional circumstance has been alleged, the Court is unwilling to deviate from the parties' agreement.

The Defendants also point out that the Court's scheduling order required the case to be trial ready by December 15, 2025. Dkt. No. 53 at 10; Dkt. No. 56 at 16; see Dkt. No. 15. The Defendants argue this also makes the Plaintiffs' summary judgment motion procedurally improper. Dkt. No. 53 at 10; Dkt. No. 56 at 16. The Plaintiffs respond that the Court's scheduling order did not contain an express deadline for summary judgment motions. Dkt. No. 60 at 4. The Plaintiffs also argue that the Court has discretion to consider an untimely summary judgment motion. Dkt. No. 60 at 4–5 (collecting cases).

The Court agrees with the Defendants. The scheduling order provided that "[t]he parties shall have the case trial ready by December 15, 2025." Dkt. No. 15. Yet, the Plaintiffs' summary judgment motion asks the Court to decide this case without a trial. A case cannot be trial ready if the Court is still determining whether a trial is necessary. This also makes the Plaintiffs' motion procedurally improper. (Even if the Court has discretion to consider an untimely motion, the Court will not do so here because the parties stipulated that this matter shall be set on for a jury trial.)

Lastly, the parties dispute whether Federal Rule of Civil Procedure 56(b) or Federal Rule of Bankruptcy Procedure 7056 provides the summary judgment motion deadline for this matter. Compare Dkt. No. 53 at 10 and Dkt. No. 56 at 17–18, with Dkt. No. 60 at 3–4. Rule 56 allows parties to file summary judgment motions "at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). In contrast, Rule 7056 requires summary judgment motions to be filed "at least 30 days before the first date set for an evidentiary hearing on any issue that the motion addresses." Fed. R. Bankr. P. 7056. However, the Court has already explained why the

Plaintiffs' motion is improper under the stipulation and the scheduling order. Therefore, the outcome is the same under either rule.

### II.    Genuine Issues Of Material Fact Preclude Summary Judgment.

The Court has already explained why it is denying summary judgment. The Court also notes the following issues as a few examples of why the Plaintiffs are not entitled to summary judgment on the merits.

Constructive fraudulent transfer claims under Section 548 require a plaintiff to show that the debtor received less than reasonably equivalent value in exchange for the transfer and:

> **(ii)**
> **(I)**
> was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
> **(II)**
> was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
> **(III)**
> intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
> **(IV)**
> made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B)(ii)(I)–(IV). The last of these four subsections is inapplicable; the Plaintiffs do not allege any transfers made under an employment contract. The Plaintiffs argue Finn's analysis establishes insolvency, inadequate capital, and an inability to pay debts as they mature under the first three subsections.

Constructive fraudulent transfer claims under the North Dakota Uniform Voidable Transactions Act also require a plaintiff to show that the debtor received less than reasonably equivalent value in exchange for the transfer and:

was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction or the debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due. . . .

[or] the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

N.D. Cent. Code 13-02.1-04–05. Both the North Dakota statute and Section 548 exclude fraudulently transferred assets when assessing insolvency. N.D. Cent. Code § 13-02.1-02(3); 11 U.S.C. § 101(32A). The Bankruptcy Code only excludes "actual" fraudulent transfers (transfers made with intent to hinder, delay, or defraud creditors), but the North Dakota statute excludes both actual fraudulent transfers and transfers that are otherwise voidable. N.D. Cent. Code § 13-02.1-02(3); 11 U.S.C. § 101(32A). Similar to the Section 548 claims, the Plaintiffs argue Finn's analysis establishes insolvency, inadequate capital, and an inability to pay debts as they became due under the North Dakota statute.

Both statutes require the Plaintiffs to establish a transfer, a lack of reasonably equivalent value for the transfer, and one of three other conditions indicating financial distress: insolvency, inadequate capital, or an inability to pay debts as they became due. Insolvency is shown by comparing debts to assets and, thus, corresponds to the so-called balance sheet test. See 11 U.S.C. § 101(32); N.D. Cent. Code 13-02.1-02. In contrast, establishing inadequate capital or the inability to pay debts as they became due involves other facts based on the nature of the business and its debts. The Plaintiffs only need to establish one of these three conditions.

As the moving party, the Plaintiffs bear the burden of proof and—with respect to the Plaintiffs' insolvency—rely entirely on Finn's analysis to carry that burden. The Defendants challenge Finn's objectivity and argue Finn's opinions are flawed and contradicted by the Plaintiffs' bankruptcy schedules (which Finn signed). Because the Plaintiffs cannot carry their

9

burden of proof without Finn's analysis, these are genuine issues of material fact for a jury to resolve.

### A. Finn's Credibility Is An Issue For The Jury.

The Defendants contest Finn's expertise and credibility. E.g., Dkt. No. 56 at 17, 19–24. The Defendants argue that Finn, who serves as the Plaintiffs' Chief Restructuring Officer ("CRO") and is now the Liquidating Trustee appointed under the Debtors' confirmed plan, is an interested party whose opinions are inadmissible as an expert witness. Id. The Defendants argue that the Plaintiffs' insolvency analysis rests entirely upon this "single, non-independent declarant." Dkt. No. 56 at 26.

The Plaintiffs respond that Finn has multiple relevant credentials. Dkt. No. 60 at 8–9. The Plaintiffs also point out that the Defendants did not retain their own insolvency expert. Dkt. No. 60 at 9. However, the Plaintiffs do not address Finn's involvement as the Debtors' CRO and the Liquidating Trustee.

The Court agrees that Finn's involvement as the CRO, the Liquidating Trustee, and a potential expert raises issues that a jury should resolve. "Determining the credibility of a witness is the jury's province, whether the witness is lay or expert." DiCarlo v. Keller Ladders, Inc., 211 F.3d 465, 468 (8th Cir. 2000). "An expert witness's bias goes to the weight, not the admissibility of the testimony, and should be brought out on cross-examination." Id. (quoting 3 Weinstein's Federal Evidence § 702.06[8] at 702–59). A reasonable jury may find that Finn's position as the Plaintiffs' CRO and Liquidating Trustee makes his analysis biased. Therefore, granting summary judgment based on Finn's analysis would be inappropriate.

10

**B. The Plaintiffs' Solvency Is An Issue For The Jury.**

The Plaintiffs argue that Finn's analyses establish the Plaintiffs' insolvency at the time of the transfers. Dkt. No. 46 at 20–26. The Plaintiffs also note that the Defendants do not offer their own insolvency analysis. Dkt. No. 60 at 9. Therefore, the Plaintiffs argue there is no genuine dispute that the Plaintiffs were insolvent at the time of the transfers.

Finn also signed the Plaintiffs' bankruptcy schedules, which show balance sheet solvency for all Plaintiffs as of July 2024. See Bk. Case No. 24-30281, Dkt. No. 37 at 2 (EPIC Midwest); Bk. Case. No. 24-30282, Dkt. No. 24 at 1 (EPIC 2023); Bk. Case. No. 24-30284, Dkt. No. 24 at 1 (EOLA); Bk. Case No. 24-30285, Dkt. No. 23 at 1 (EC West). Of course, solvency at the time of the transfers is what matters. Nevertheless, a reasonable jury could wonder why a business would file bankruptcy after becoming solvent—especially when the same potentially-biased individual prepared both analyses. The Plaintiffs have the burden of proof, and, if a jury finds that Finn is biased, the Plaintiffs may not meet that burden.

**1. EPIC Midwest's Solvency Is An Issue For The Jury.**

Regarding EPIC Midwest's financial condition, Finn prepared balance sheet tests for September 2, 2021; October 12, 2021; and October 19, 2021. Dkt. No. 49-4 at 25. Finn also prepared a cash flow test summarizing each month from January 2019 to March 2024. Dkt. No. 49-4 at 49–54. The date of the relevant transfer was August 27, 2021. See Dkt. No. 46 at 19–21. The problem with Finn's analysis is that none of the balance sheet tests address the transfer date.

Another issue is that Finn's analysis shows positive cash flow for August and September 2021. Dkt. No. 49-4 at 51. Finn's analysis also shows increasing solvency from September 2021 through the petition date. Compare id. at 25, with id. at 27, 33. These issues suggest the Plaintiffs

11

also may not meet their burden of showing inadequate capital or an inability to pay debts as they became due.

**2. EPIC 2023's Solvency Is An Issue For The Jury.**

Regarding EPIC 2023's financial condition, Finn prepared balance sheet tests for September 5, 2023; December 11, 2023; December 14, 2022; and August 9, 2023. Dkt. No. 49-4 at 65, 96. Finn also prepared a cash flow test summarizing each month from August 2022 to March 2024. Dkt. No. 49-4 at 86–87. The dates of the relevant transfers were: December 14, 2022; August 9, 2023; September 1, 2023; and December 11, 2023. See Dkt. No. 46 at 21.

Finn did not prepare a balance sheet test for September 1, 2023, and the balance sheet test for December 11, 2023, shows balance sheet solvency before deducting the allegedly fraudulent transfer. Dkt. No. 49-4 at 65. Finn makes this deduction because both the North Dakota statute and the Bankruptcy Code exclude fraudulently transferred assets when assessing solvency. Id. at 67; see N.D. Cent. Code § 13-02.1-02(3); 11 U.S.C. 101(32A). The Defendants dispute Finn's approach and respond that an entity extending a loan does not simply reduce its assets by the loan amount; it also records a receivable of equal value. Dkt. No. 56 at 29.

Finn's approach, however, likely puts the cart before the horse. No court has found that the allegedly fraudulent transfer was "actually" fraudulent or otherwise voidable. Neither statute permits Finn to deduct those transfers from EPIC 2023's assets based on the Plaintiffs' allegations that the transfer was fraudulent or otherwise voidable. Because Finn's report shows that EPIC 2023 was solvent as of the December 11, 2023 transfer, the Plaintiffs may not meet their burden of showing that EPIC 2023 was insolvent at the time of that transfer.

Finn's analysis does show balance sheet insolvency for the December 14, 2022 and August 9, 2023 transfers. Dkt. No. 49-4 at 96. However, as the Court has already observed, the Plaintiffs

rely entirely on Finn's analysis despite Finn's potential bias and the other documents signed by Finn, like the bankruptcy schedules, that a reasonable jury could find undermine his credibility. Therefore, a jury, and not the Court, should determine whether the Plaintiffs have shown insolvency.

EPIC 2023 also may not meet its burden of showing it was unable to pay debts as they became due or had unreasonably small capital for its business. Finn's cash flow analysis shows positive cash flow during August 2023 and negative cash flow for December 2022, September 2023, and December 2023. Dkt. No. 49-4 at 86–87. However, for the latter three months, Finn's analysis shows positive cash flow for either the month before or after the transfer (or both). Id.

Neither the North Dakota statute nor Section 548 identifies cash flow as a standalone, relevant metric. The fact that cash flow was negative during the month of the transfer does not establish that EPIC 2023 was unable to pay debts as they became due or had inadequate capital for its business—especially when Finn's own analysis shows EPIC 2023 becoming more solvent over time. Compare Dkt. No. 49-4 at 65, 96, with id. at 67, 73. Finn's analysis conflates cash flow with ability to pay debts and adequacy of capital, but neither statute's language justifies that approach. Therefore, a reasonable jury may find that the Plaintiffs do not meet their burden.

**3. EOLA's Solvency Is An Issue For The Jury.**

Regarding EOLA's financial condition, Finn prepared a balance sheet test for April 4, 2024. Dkt. No. 49-4 at 127. Finn also prepared a cash flow test summarizing each month from February 2022 to March 2024. Dkt. No. 49-4 at 141–43. The date of the relevant transfer was April 4, 2024. Dkt. No. 46 at 23.

Finn's report shows balance sheet solvency before deducting the allegedly fraudulent transfer. Dkt. No. 49-4 at 127. This deduction is improper for the same reason that the Court

13

explained above regarding EPIC 2023's solvency as of December 11, 2023. Therefore, EOLA may not meet its burden of establishing insolvency.

Similarly, Finn's cash flow analysis for EOLA ends with March 2024, but the relevant transfer occurred on April 4, 2024. Dkt. No. 49-4 at 143. Finn's report also shows EOLA becoming more solvent between April 2024 and July 2024. Compare Dkt. No. 49-4 at 127, with id. at 128, 133. Therefore, EOLA also may not meet its burden of showing inadequate capital or an inability to pay debts as they became due.

**4.  EC West's Solvency Is An Issue For The Jury.**

Regarding EC West's financial condition, Finn prepared a balance sheet test for October 14, 2021. Dkt. No. 49-4 at 153. Finn also prepared a cash flow test summarizing each month from December 2022 to March 2024, as well as several earlier months. Dkt. No. 49-4 at 168–69. Finn's report states the relevant transfer occurred on October 14, 2021. Dkt. No. 49-4 at 153. (The Plaintiffs elsewhere state that the transfer date was October 18, 2021, but it does not change the Court's analysis. E.g., Dkt. No. 1 at 15; Dkt. No. 46 at 13.)

Finn's report shows balance sheet solvency for EC West at the time of the transfer before deducting the allegedly fraudulent transfer. Dkt. No. 49-4 at 153. However, deducting the transfer is improper for the reasons explained above. Therefore, EC West may not meet its burden of establishing insolvency.

Finn's cash flow analysis for EC West includes no figures for October 2021—the month of the relevant transfer. Dkt. No. 49-4 at 168. The analysis covers January 2019, December 2019, December 2020, December 2021, and then each month from December 2022 to March 2024. Dkt. No. 49-4 at 168–69. Finn's report also shows EC West becoming more solvent over time. Compare

Dkt. No. 49-4 at 153, with id. at 154, 158. Therefore, EC West also may not meet its burden of establishing inadequate capital or inability to pay debts.

### C. The Defendants May Have Been "Mere Conduits."

As already explained, the Court denies summary judgment. Nevertheless, the Court will briefly address one of the many defenses raised by the Defendants that defeats summary judgment—the mere conduit defense.

Avoided transfers may be recovered from the initial transferee (among others). 11 U.S.C. § 550(a). "[T]o be an initial transferee, a party must have dominion and control over the transferred funds." In re AgriProcessors, Inc., 859 F.3d 599, 605 (8th Cir. 2017) (quoting In re Reeves, 65 F.3d 670, 676 (8th Cir. 1995)). However, "an entity that is in possession of transferred funds as a 'mere conduit' between other parties in a transactional chain is not a 'transferee' within the scope of § 550(a)." In re Lacina, 451 B.R. 485, 492 (Bankr. D. Minn. 2011) (quoting In re Bauer, 318 B.R. 697, 701 (Bankr. D. Minn. 2005)). "Simple possession of funds, coupled with a one-time act of directing them on to a further transferee," is insufficient. Id. at 491 (quoting Bauer, 318 B.R. at 700). Rather than address each Defendant individually, the Court analyzes Gateway Arches as an example.

Gateway Arches' Treasurer and Vice President, Kyle Oetker, states that the EPIC companies exercised exclusive control over Gateway Arches' operations and finances. Dkt. No. 58 at 2–3. Oetker states that the EPIC companies made various payments or transfers of Gateway Arches' funds for purposes unrelated to the company's operations. Id. This suggests Gateway Arches may have been a mere conduit and, thus, not a transferee under Section 550(a).

Similarly, a reasonable jury examining the Gateway Arches' bank records could find that the Gateway Arches was a mere conduit. For example, Gateway Arches' bank statement for

September 2023 raises numerous questions. On September 1, Gateway Arches received the allegedly fraudulent transfer of $115,000 from EPIC 2023. Dkt. No. 49-3 at 2, 6. The same day, Gateway Arches wrote a check for $225,000 with the notation "draw funding." Dkt. No. 49-3 at 2, 6. On September 11, Gateway Arches received a $817,848.21 advance on an unspecified loan. Dkt. No. 49-3 at 6. The same day, Gateway Arches transferred out $818,547.51 with the notation "ICS." Dkt. No. 49-3 at 2, 6. On September 19, Gateway Arches wrote two checks totaling $1,346.37. Dkt. No. 49-3 at 6. The same day, Gateway Arches received a transfer for the exact same amount. Dkt. No. 49-3 at 6.

Drawing all reasonable inferences in favor of Gateway Arches, a reasonable jury could conclude that Gateway Arches never did more than possess these funds for several days before "directing them on to a further transferee" for purposes unrelated to Gateway Arches' business. See Lacina, 451 B.R. at 491. A jury, and not the Court, should make that determination. (The Defendants also heavily rely on the defense of in pari delicto, which "'bar[s] recovery' when the plaintiff's 'fraud was no less than that of the defendant.'" Kelley v. BMO Harris, N.A., 115 F.4th 901, 904 (8th Cir. 2024) (quoting State by Head v. AAMCO Automatic Transmissions, Inc., 199 N.W.2d 444, 448 (Minn. 1972)). However, this defense may not apply where a plaintiff stands in the shoes of creditors under Section 544 or simply asserts a statutory right under Section 548.)

## CONCLUSION

For the reasons just stated, the Plaintiffs' summary judgment motion is procedurally improper and, therefore, denied. Even if the Court reaches the merits, genuine issues of material fact preclude summary judgment. The Court may issue this non-final order even if this is not a core proceeding, and even if the Court lacks constitutional authority to enter final orders without the parties' consent. Therefore,

16

**IT IS HEREBY ORDERED**:

1. The Plaintiffs' Motion for Summary Judgment as to Fraudulent Transfer Claims is denied.

2. This adversary proceeding will be set on for a jury trial in the United States District Court for the District of North Dakota.

**BY THE COURT:**

Dated: *June 3, 2026*

s/ William J. Fisher

William J. Fisher
United States Bankruptcy Judge